1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,      )
                               )
              Plaintiff        )
                               )
         vs                    )   24-CR-107
                               )
MYKAYLIAH HEVENER,             )
                               )
              Defendant        )
_____)


TRANSCRIPT OF PROCEEDINGS
*Sentencing*
BEFORE THE HONORABLE JULIA K. MUNLEY
THURSDAY, JANUARY 30, 2025; 10:00 A.M.
SCRANTON, PENNSYLVANIA


FOR THE GOVERNMENT:
    LUISA BERTI, ESQ.
    Assistant United States Attorney
    Suite 311
    235 N. Washington Avenue
    Scranton, Pennsylvania  18503


FOR THE DEFENDANT:
    JOSEPH G. PRICE, ESQ.
    Corbett Price Law
    75 Glenmaura National Boulevard
    Moosic, Pennsylvania  18507



Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.

_____

KRISTIN L. YEAGER, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA 18503

2

THE COURT: We are here in the matter of United States v. Mykayliah Hevener, docket number 3:CR-4-107. Today is the time and date for sentencing of the Defendant in this matter, January 30th, 2025.

First and foremost, will counsel please introduce themselves, starting with counsel for the Government?

MS. BERTI: Thank you, Your Honor. Luisa Berti, on behalf of the United States. I'm seated here at counsel table with Special Agent Eric Bailey from the FBI.

THE COURT: Good morning to both of you. How about Defense counsel, please?

MR. PRICE: Good morning, Your Honor. Attorney Joseph Price, on behalf of Mykayliah Hevener, who is present in court today.

THE COURT: Good morning to you and good morning, Ms. Hevener.

My understanding is there are no objections to the Pre-Sentence Report. Is that correct, Ms. Berti?

MS. BERTI: That is correct, on behalf of the Government, Your Honor.

THE COURT: Is that correct, Mr. Price?

MR. PRICE: Yes, Your Honor. I had a chance to go over the Pre-Sentence Report with Ms. Hevener in detail, and after going through the report, we have no objections.

THE COURT: Okay, very good. Did you have sufficient time to go over the Pre-Sentence Report with your client?

3

MR. PRICE: Yes.

THE COURT: Ms. Hevener, have you, yourself, read and reviewed the Pre-Sentence Report with your lawyer?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did you have enough time to review it with him and discuss it?

THE DEFENDANT: Yes.

THE COURT: Ms. Berti, on behalf of the Government, did you, also, review the Pre-Sentence Report?

MS. BERTI: I did, Your Honor, and I did have enough time to review it. I do want to clarify something. I was remiss, I did want to bring this to the Court's attention, because I did speak with Probation about this yesterday.

At Paragraph 75 of the PSR, where it talks about restitution, I didn't really notice that until yesterday, but I don't think it's, especially, at issue, in this particular case, but I did notice that the Paragraph at 75 says that;

Restitution shall be ordered, unless the Court determines that the complication and prolongation of the sentencing process resulting from the fashioning of the restitution requirement outweighs the need to provide restitution to any victim through the criminal process, and, then, cites that particular guideline section.

I do believe that, because this particular crime, the restitution is enumerated under the Statute at 2559, I don't

4

think that the Court is permitted to make -- I guess, to weigh restitution, because of that particular reason. I don't think that the guidelines would trump the actual Statute that mandates restitution.

In any event, I don't think that this particular scenario would be at issue in this case, because this, I think, really, goes to cases where you're dealing with hundreds or thousands of fraud victims in those types of schemes. I don't think that's really an issue, but I did want to bring that to the Court's attention, but I don't think there's, sort of, an option-out when we're dealing with this specific enumerated section of the U.S. Code to permit the Court to fail to order restitution, should that be requested by the Government for the victims.

THE COURT: Thank you, Ms. Berti, for putting that on the record. It is mandatory restitution. Is there any objection to that, Mr. Price? I mean, clearly, under the Statute, because of the type of crime it is, it is mandatory restitution.

MR. PRICE: Yes, Your Honor, I have no grounds on which to object.

THE COURT: Okay, very good. Thanks for noting that.

All right, so, now, that I have -- I just want to indicate on the record that I have carefully read and reviewed the Pre-Sentence Report, I've, also, read and reviewed counsel's memorandum that you have provided me, along with any

5

attachments. I know the Government has included attachments, and I have reviewed those carefully. Those are always helpful. I know, sometimes, counsel doesn't like to provide -- not doesn't like to provide -- but everybody is very busy, but they certainly assist the Court. So thank you for those, and the Court has reviewed all of that.

So as there are no objections to the Pre-Sentence Report, I am going to adopt, go ahead and adopt the findings contained within the Pre-Sentence Report.

And for the record, I'd note that, at the time of the guilty plea in this matter that took place on September 24, 2024, that the Defendant pled guilty to Count 1 of the indictment, and that is a violation of 18 USC Section 2251(a), that is, Production of child pornography, and that carries a mandatory-minimum sentence of 15 years and a maximum sentence of 30 years, under this particular Statute.

At the time of the guilty plea, among other things, at the time of the guilty plea, the Defendant agreed to the following:

The Defendant agreed, among other things, to the forfeiture of assets that are listed out in the forfeiture allegation of the indictment.

The Defendant -- going back to the issue of restitution -- the Defendant agreed to make full restitution, in accordance with the schedule to be determined by the Court.

The Defendant agreed to allow the Court to determine

appropriate restitution for identifiable victims in the images of child pornography, under the Statute. The Defendant understood that the Court must order the Defendant to comply with all Sex Offender Registration Requirements, under the Sex Offender Registration and Notification Act, if applicable.

The Defendant waived her right to appeal the conviction and the sentence imposed. I'm not reading everything, just certain pertinent particulars, at the time of the guilty plea.

And, on that date, the Defendant admitted that she engaged in certain conduct in the production of child pornography involving a minor, a toddler, who, in fact, happened to be her son.

By way of background, on April 18, 2024, the Defendant was arrested by FBI agents. She appeared before, at that time, United States Magistrate Judge Joseph Saporito, now, U.S. District Court Judge Joseph Saporito, she appeared before him the following day and was detained. She was indicted on the charge that I've already gone through, as well as Count 1, and that was Distribution of visual depictions of a minor engaged in sexually explicit conduct.

Defendant's detention was then continued.

At this time, I am going to go ahead and address the guideline range and the sentencing options, and I'm going to go through those carefully.

So, in this particular case, we have a total offense level

of 43, we have a criminal history category of 1. This, on the sentencing table, it yields a sentence of life imprisonment, however, under the Statute, it authorizes -- the Statute authorizes imprisonment, as I mentioned, the maximum sentence to be imposed is 30 years, which is less than the minimum of the guideline range.

So as a result, the guideline term of imprisonment here comes out to 360 months, pursuant to United States Sentencing Guideline 5(g)1.1(A ).

Going to supervised release, by Statute, there is a mandatory range for supervised release of five years to life, and that is 18 USC Section 3583(k).

Under the guidelines, the range is five years to life, pursuant to guideline section 5(d)1.2(B)2.

Going to Probation. The Defendant in this case is ineligible for Probation, as this is a Class B Felony, requiring a mandatory term of imprisonment.

As far as fines, there is a maximum fine that can be imposed up to $250,000. The guideline fine range goes from $50,000 to $250,000.

There is, also, an assessment that the Court is required to impose of $5,000 per count on any non-indigent person convicted of an offense that falls under Chapter 110, along with other chapters listed.

The Court will certainly address the Defendant's ability to

pay any fine, including that assessment, that 5,000-dollar assessment, the Court will certainly address that, as we go forward.

Now, as far as a special assessment, there is a special assessment that is mandatory, and that is an assessment of $100.

We already discussed restitution. The Court is required to order full restitution, without consideration for the Defendant's economic circumstances, but Defendant's economic circumstances are relevant to determining the manner and schedule of payment.

Here, there was no information provided to the Court regarding restitution actually being submitted at this time. I'm aware, through the Government's Sentencing Memo, that they have requested a determination as to restitution to be deferred or kept open, as allowed, and I, specifically, reviewed it very carefully, Title 18 USC Section 3664(d)5.

The Defendant did agree, at the time of the guilty plea, to pay full restitution. The Government is indicating, I believe, Ms. Berti, that you would provide notice of any restitution that is being sought, at a later point in time, and provide copies of any request in the future, certainly, with notice and hearing.

Certainly, the Court can address that later, and I can hear argument on that, but let me just ask, did I state all of that

correctly, Ms. Berti?

MS. BERTI: That's accurate, Your Honor.

THE COURT: Let me just address it, now. Mr. Price, is there any objection with regard to that? I believe, that the issue is because the victim in this case happens to be a very small minor, a toddler, approximately, two to three years of age, that any, you know, whatever it might be, the basis of restitution hasn't been discovered as yet, because of the age.

Is there any objection with regard to deferring that in the future and the Government providing that notice and opportunity for a hearing with a showing of good cause?

MR. PRICE: No objection.

THE COURT: Okay, very good. Anything further on that point, Ms. Berti?

MS. BERTI: No, Your Honor.

THE COURT: I think I covered all of the areas, with regard to options for sentencing. So I go, now, to Motions for Departure.

Ms. Berti, is there any Motion for Departure, pursuant to an enumerated section of the guidelines?

MS. BERTI: No, Your Honor.

THE COURT: Mr. Price, is there any Motion for Departure, pursuant to an enumerated section of the guidelines? I understand, through your memo, a request for variance, but my question, now, is, is there any Motion for Departure, pursuant

to an enumerated section of the guidelines?

MR. PRICE: No, Your Honor.

THE COURT: So I turn to you, Mr. Price, at this point -- actually, before that.

The next step in the sentencing procedure is that I apply the factors and consider the factors set forth in Title 18 Section 3553 to determine a just punishment here.

So if you are making a motion or request for a variance, you can, certainly, make your motion and argument on same, as I call on each of you to address the Court in full, relative to the 3553 factors that I must consider.

So I am going to call on you first, Mr. Price. I did review your Sentencing Memo, but I appreciate full argument today. So on behalf of your client, go right ahead.

MR. PRICE: Thank you, Your Honor. Prior to me addressing the Court, I believe, Ms. Hevener would like to address the Court on her own behalf, and, then, I will supplement that.

THE COURT: Okay, that is perfectly fine. Usually, I call on Defense counsel first, and, then, I call on the Defendant, but however you wish to do it, however you wish to do it.

MR. PRICE: If the Court would oblige, I would like Ms. Hevener to address the Court first.

THE COURT: Sure. Let me ask you, are there any witnesses here to address the Court, other than your client?

MR. PRICE: No.

THE COURT: So, Ms. Hevener, certainly, you may address the Court now, and, then, your attorney indicates that he wishes to speak following you, so this is your opportunity to address the Court, and I'd be happy to hear from you. Go right ahead.

THE DEFENDANT: Your Honor, firstly, I just want to thank you for allowing me the opportunity to speak before you today. I will not sit here and attempt to minimize or rationalize my part in this situation, at all. I have hurt the ones that I lost the most by my actions, and there is no excuse for that.

I had been living with an approval-seeking behavior, and it caused me to ignore gut feelings and dismiss red flags. This event was the biggest lapse in my judgment and my character. I have admitted to myself, my family, to God and all of those who are before me today the nature of my wrong.

With that said, I also want to share the remorse that comes with that. Growing up without my biological parents, it was incredibly stressful as a child and I ended up never feeling good enough. Then, adding the trauma that Mr. Campetti had mentioned in my report, it, of course, did not make life any easier for me.

All I ever wanted, and yes, I'll admit, even yearned for sometimes was constant acceptance. Anyone that I could get it from, I tried to obtain it. This ended up being Mr. Egli's driving force in becoming close to me, eventually, leading to the reason that we are here today.

12

I will always admit that I made a huge mistake, and, now, I must pay those consequences, however, I will not be the only one suffering from my actions. My children and my family will, also, have to deal with my punishment. I know, as mentioned, what it is like to grow up without my mother, and I do not want my children to suffer as intensely as I have.

In the past nearly 10 months, I have worked very hard to show that I want to be the best me that I can be. I have earned 47 certificates, I've completed over 170 hours of learning and have engaged in over 170 learning videos, as well, and I will continue to increase that number daily.

I work in this way to slowly learn how to not only make amends, but to rebuild trust, hopefully, gain forgiveness of any sort, and, ,mostly to gain the ability to get reunification with my children.

The lessons I've learned during my incarceration have been bitter and painful, and I simply want to show all that I am sorry, that I will work hard to improve myself every day, and to be the best mother my two amazing children deserve to have.

Thank you, again, for allowing me this opportunity to speak. That's all I have to say.

THE COURT: Thank you, Ms. Hevener. Go right ahead, Mr. Price, on behalf of your client.

MR. PRICE: Thank you, Your Honor. And I thought it was important that Ms. Hevener addressed you, prior to me, because

it really supplies the Court with what we're trying to do here, today, which is, essentially, provide a road map for the unique twist and turns that Ms. Hevener's life took, up to the point that she made this extreme lapse in judgment with Mr. Egli and her child, and the unique road map that made her more susceptible than others to making this mistake.

She is not, in any way, trying to cast herself as a victim here, and I believe her words go a long way towards cementing that fact.

Now, what we are here today to do is not to have a sentence that's reasonable, but a sentence that is sufficient but not greater than necessary to achieve the sentencing goals of the Sentencing Reform Act 18 USC 3551, et. seq.

So what are those goals? The goals, as outlined in Gall v. United States by the Supreme Court is;

A. Reflect the seriousness of the offense. Promote respect for the law and provide just punishment.

B. Afford adequate deterrence to criminal conduct.

C. Protect the public from further crimes of the Defendant.

D. Provide the Defendant with educational or vocational training, medical care or other correctional treatment in the most effective manner.

Now, the Sentencing Reform Act has been described as imposing an overarching institution for the District Courts to follow in selecting that sentence that is sufficient but not

14

greater than necessary to achieve the sentencing goals. Your Honor outlined two of the first steps, you know, determining the guideline range, seeing if there's any departures, and, then, going towards the 3553(a) factors, which we are here, now, to do.

As the Court noted, I'm going to be asking for a significant downward variance in the sentencing guideline range, based on the application of the 3553 factors to this particular Defendant in this particular crime.

So 3553(a)1, the nature and circumstances of the offense and the history and characteristics of the Defendant.

Your Honor, the nature and circumstances of the offense that we're here today for sentencing are horrible, in all aspects. Congress, the legislature, has, I believe, fully demonstrated the reprehensive aspects of all Production of Child Pornography cases that do occur by imposing a 15-year mandatory-minimum sentence for anyone who is found to have violated that Statute.

There are some cases, though, that are more vile than others. I included the U.S.A. v. Michael Heinrich case, because that is a case that does have more disturbing factual circumstances than the one we are here today, but, again, the one we are here on today is still horrible.

Ms. Hevener, while live video-streaming with an individual out in Iowa, she undertook her actions without the intent of

15

producing child pornography. During the course of the interactions with Mr. Egli, an individual who she had known for many years, she made that mistake that her life circumstances made her more susceptible to making, in terms of looking for Mr. Egli's approval and acceptance, when he requested that she remove her child's diaper to expose his genitals for Mr. Egli's sexual gratification. That is what occurred here, okay.

And there is nothing Ms. Hevener could do to take that back. If she could, she would. But she made that mistake. But in terms of -- the legislature has determined, again, that the mandatory-minimum for such conduct is 15 years, and the guideline range takes into account various other factors, in terms of her being a parent, the child's age and whatnot, to get to the level that it did get to.

So the nature and circumstances of the offense, although, horrible, in terms of the Statute, we are here today, Production of Child Pornography, I believe, they rise to the level where the mandatory-minimum is most applicable, the 15 years.

The history and characteristics of the Defendant. Your Honor, this is her first time ever standing before a Court for sentencing on anything. Anything. I don't even believe she has a traffic violation. This is her first time being sentenced on anything. Being accused of violating a Statute, either, a Commonwealth or State Statute or Federal Statute, okay. And the

Statute that she's here today for is one of the most serious that you could break in the entire nation, but that doesn't change the fact that this is her first time. She has no history of criminal conduct throughout her life.

In fact, prior to her incarceration, she had steady employment for over three years with the same employer, which was a school, an educational facility, and there were no indications, no reports of any inappropriate behavior when she was there.

She is one that, through her acceptance of responsibility, I believe, proves to this Court that she will not make this mistake again. Her life is such that, when you look at it, it's hard, at this point, right now, I think, for sympathy, but I ask for empathy, you know.

From her youngest years, she was abandoned by her biological parents and taken in by strangers. Throughout her life, her mother came in and out, under the influence of drugs, taking her for weekends, exposing her to heinous circumstances, through the use of drugs and alcohol and other intoxicating substances. It's a sad life. One that she, herself, was victimized as a child. And it's such that, like I said, she is just more susceptible than others.

In taking in those unique circumstances, I believe the factor heavily weighs in favor of a downward variance closer to the mandatory-minimum of 15 years here, and it will, again,

promote the goals of reflecting the seriousness of the offense. And if you look at the circumstances of this case, when you promote respect for the law, how does one do that, in a sentencing manner? Is it just by the length of sentence?

I would state here, in this case, you know, again, the foil case of this is United States v. Michael Heinrich, where he was indicted in May of 2017, fought tooth and nail for years, every corner he could, and, then, on the eve of jury trial in June of 2021, he accepts a guilty plea and gets the 15-year mandatory-minimum for three counts of the same crime we're here today for one count.

So, I think, when you look at Ms. Hevener, she was indicted April 23rd of 2024, takes immediate responsibility, takes immediate acceptance, immediately starts trying to better herself through the resources available to her at Lackawanna County Prison, such that she enters her guilty plea five months later on September 9, 2024.

Your Honor, I submit to the Court that the best way that this Sentencing Court can promote respect for the law is to give great deference and weight to Ms. Hevener's acceptance of responsibility, here, in the fact that she did not unnecessarily use this Court and waste this Court's time, because we would be here, eventually. The weight of the evidence was such that we would be here, eventually.

But she accepted that responsibility, knowing that the

18

consequence would be, at least, 15 years incarceration, knowing that the guidelines that were going to apply were going to be such that they were astronomical. She accepts those consequences and appears here today, knowing full well what she did was horrific, and the Court can promote respect for the law by taking into account the speediness of her acceptance of responsibility.

Again, just punishment. Congress has stated that the mandatory just punishment here is 15 years, and if you look at the nature and circumstances of the offense, the history and characteristics of Ms. Hevener, I believe, just punishment is the 15-year mandatory-minimum.

Now, as we look at the remaining factors, the need for the sentence imposed to reflect the seriousness of the offense, again, promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the Defendant, and to provide the Defendant with the needed educational and vocational training, okay, so we went through a lot of that.

But, again, to protect the public from further crimes of the Defendant, her acceptance of responsibility, I think, provides the Court with the evidence required to make a determination that she appreciates her conduct and is not going to put herself in a position, once she, eventually, is

released, to put the public at risk of any further harm. She hadn't prior to this, and, I believe, that is the best data that the Court could look at in determining that, once released from incarceration, at any point, the Court can be confident that she will not subject the public to any further crimes. She knows what she did was wrong, and the Court has good indication of that, in terms of her own words, her acceptance of responsibility. It's not wishy-washy in her head, she knows exactly what she did, and she accepts those consequences that the Court is here today to provide.

Your Honor went through the 3553(a) factors, the kinds of sentences available. You know, Congress has boot-strapped the Court, in terms of not imposing a sentence less than 15 years, but, also, on the other end, not more than 30. So what sentence in that range would be sufficient but not greater than necessary to achieve the sentencing goals? I submit to Your Honor it's the 15-year mandatory-minimum, again, based, largely, on the reasons that I have already elucidated and, again, to promote the respect for the law, in terms of the radical acceptance of responsibility here.

The guideline sentence, Your Honor -- the guideline sentence, here, is life, but for the Statutory maximum of 30 years, the guideline range is life. I mean, for a first offense, a criminal history of 1, her first offense, to subject her to the maximum that Congress has stated one can receive for

this type of crime, and that's what the guideline is, based on that, I do not believe that that is anywhere near necessary to achieve the sentencing goals of the Sentencing Reform Act.

The worst of the worst, all they would get is 30 years, the worst of the worst. Multiple felonies, multiple victims, multiple years, multiple images of child pornography depicted on devices or other possession, which Ms. Hevener has none. There was zero, zero evidence that, other than this, Ms. Hevener was prone to view or engage in child pornography.

Again, I believe, that should weigh strongly in favor of this Court varying downward, because the studies out there show that if you have child pornography, other than the one that you produced, that's kind of your thing. This, Ms. Hevener, there's none.

So, again, I believe, the factors require the Court to strongly consider varying downwards towards the mandatory-minimum sentence of 15 years, which we would be asking for.

And, then, (a)6, Your Honor, the need to avoid unwarranted disparity among Defendants with similar records who have been found guilty of similar conduct, Your Honor.

It's hard to say -- the similarity of the conduct between Ms. Hevener and Mr. Heinrich and the case alluded to in the memorandum, you know, they both produced child pornography. There's no question about that. But, again, Mr. Heinrich had

thousands of images of other child pornographic production, and he is serving the 15-year mandatory-minimum. That factor, again, strongly supports varying downwards to be more in line with the sentences for similar conduct and similar records.

So, again, the need to avoid unwarranted -- and I do believe it's an unwarranted disparity here, because, again, five months between indictment and filing acceptance of responsibility. Ms. Hevener started to accept responsibility long before that, too.

Once we went to -- once we appeared in this building and she viewed the video that led to her being here today, there was no -- again, she didn't go back and forth whether or not she committed a crime, she knew that day that she was going to accept responsibility. She saw what she did and she said, I did it, under the letter of the law, I did it.

Now, (a)7, the need to provide restitution to any victims of the offense. We discussed that, that would be brought up if and when the Government develops a basis for restitution in this case, so that's open-ended.

So here, I think, the Court is allowed to look at multiple factors, not just one in isolation. Multiple factors, here, make the case for a downward variance to the 15-year mandatory-minimum. The criminal history here, the immediate acceptance of responsibility, the ability of the Court to promote respect for the law by Ms. Hevener's acceptance of

22

responsibility, her unique circumstances and life events that led to her being here today, I strongly ask the Court to give serious consideration and, ultimately, to impose a sentence that requires no more than the 15-year mandatory-minimum for the one count that she is here to be sentenced on today. I thank you for your time.

THE COURT: Thank you, Mr. Price. Ms. Berti, on behalf of the Government.

MS. BERTI: Thank you, Your Honor. Your Honor, I'm struck by Ms. Hevener's words. She says that the thing that most profoundly affected her was growing up without parents, and here we sit, with Ms. Hevener having condemned her children to the same fate that she says was the single most important factor in the misalignment of her life.

When Ms. Hevener was interviewed by FBI and then arrested, I asked the agents, Did she cry? When Ms. Hevener came to her initial appearance and another United States Attorney covered the hearing for me, I said to that U.S. Attorney after the hearing, Did she cry?

Ms. Hevener has an interesting affect that troubles the Government. She does not strike me as someone who is sorry for having done this, but, instead, someone who is sorry that she got caught.

I am troubled, in fact, by the lack of emotion that Mykayliah Hevener seems to demonstrate and has demonstrated

throughout the entirety of this criminal case. What a 15-year sentence would do with good and gained time would allow her release at a point in time when her daughter would be, approximately, a pre-teenager. It would allow her release at, perhaps, the most vulnerable period of her daughter's young life.

I didn't intend, really, to hash out all of the facts of this case, because I know Your Honor is aware of them, but I do think that it's important to touch on a few things, based on some of the arguments that Mr. Price made.

So I'll turn to my Sentencing Memo, because I do think it's important. Mr. Price said that Mykayliah Hevener took the actions that she took without the intent of producing child pornography.

What I write, here, is that, Upon discovering her boyfriend's interest in child pornography, Mykayliah Hevener did the unthinkable. She fully embraced his deviant pedophilic nature, and at her first opportunity, sacrificed her two-year-old son to him. Well, in fact, Your Honor, her son, at the time, as far as we know that this behavior began, wasn't 2, he was 1. This behavior continued past his birthday.

And I mention, here, in this case, investigators found evidence of a small assortment of child sexual abuse material. They saw a Snapchat conversation and, really, what that means is Mykayliah Hevener and her boyfriend Benjamin Egli were,

maybe, it's more common for people to understand it as, sort of, Facetime or, sort of, doing, like, a Facetime, they're having a live video chat with each other over the phone, and what Mr. Egli is doing is he's recording what Ms. Hevener is performing with her son for him.

So when the investigators in Iowa became aware of that, they became aware of materials that were in Mr. Egli's possession. But what is important, here, is that, in addition to that live-streaming of Snapchat, which was preserved, as I detail, here, there is another video that is a video that was not something that was created from a live stream, but a video where Ms. Hevener would have sent that to -- produced it and sent it to Mr. Egli.

In this video, she's rubbing her baby's penis, in an attempt to masturbate the child for her boyfriend and asks the baby how he likes touching his penis. When the baby attempts to squirm away, Ms. Hevener laments that she cannot produce a more graphic scenario for her boyfriend and apologetically says to him, I tried.

Additionally, there are images that were discovered by the investigators of her documenting herself attempting to masturbate her baby in a bathtub and photographs of herself nude with her baby's hands near her exposed vagina.

The reason I referred in my Sentencing Memo to the small assortment of the documentary proof of the baby's abuse is

because we know it's a small assortment, based on Ms. Hevener's own statements to the FBI. The charged criminal conduct in this case began -- I'm sorry -- the charged criminal conduct at issue was for videos that were created on April 29 of 2023. But what Ms. Hevener told investigators was that she stopped sending these videos to Mr. Egli in December of 2023, which means that, for nine months, she engaged in this conduct with her son.

Importantly, Your Honor, what Ms. Hevener tells investigators is that she was aware that Benjamin Egli had a sexual interest in incest and bondage. She stated, I sent him pictures of my son, thinking that only he would see it, but since you're here, that must mean that he shared them.

Ms. Hevener says that Mr. Egli would tell Ms. Hevener exactly what he wanted her to do with her son, and she would send photos and videos via Snapchat. She said she would send photos and videos via Snapchat.

For instance, Mr. Egli told Ms. Hevener to take a video of her jerking him off. He, also, instructed her to play with the baby's penis in the bathtub. She indicated to the FBI that this meant jerking miles off in the bathtub. She was, also, instructed to play around with Miles while -- play around with the baby, while she was naked, and show Mr. Egli the baby's genitals, while Mr. Egli masturbated. She knew Mr. Egli was masturbating, because she observed it on the screen. She

admitted that she knew Mr. Egli was sexually attracted to her son.

She stated, I was adamant that he was not allowed to share these with anyone. She said she knew Mr. Egli was sexually attracted to young kids. Other than my son, I figured he liked kids around 13 or 14. Most often, Mr. Egli would ask her to jerk him off or play with herself, while holding him.

She says that Mr. Egli was a member of online groups which shared an interest in incest. He told her that he would talk in these groups with families that shared the same interest. Mr. Egli told her, to participate in these groups, it was necessary to share photos of children engaged in sex acts. She, then, said Mr. Egli shared these photos with her.

The photos in the videos depicted young children performing acts of incest. She described seeing images of boys, approximately, 10 or 11 years of age. She knew the content was of a young child and said that she knew he was so small, because she says, His pee-pee wasn't even there. She said she stopped asking for pictures because it was starting to get weird, because the children were too young.

Additionally, what she, also, told the FBI, when they asked her whether or not she had any images of child pornography, she advised, There may be nude pictures or videos of her son, which she had sent to Mr. Egli in the past still on her cell phone. She, possibly, had media saved in the My Eyes Only

password-protected section of Snapchat. When the FBI asked her to open that for them, she attempted several passwords in the My Eyes Only Snapchat but was unsuccessful. She reiterated that she didn't believe Mr. Egli was sharing the media of her son out to other people.

So with regard to any argument that she didn't have the intent of producing child pornography, that is completely and totally false.

With regard to whether or not Ms. Hevener had any retained images of child pornography, we don't know, because Ms. Hevener was not able to recall her password and FBI was not able to look at that particular folder in her phone.

So the other thing I do want to address, and I don't think Mr. Price makes this argument here, today, in court, though, it is touched upon in his Sentencing Memo is that this is not a case that involves any type of coercion, this is not a case that involves Mr. Egli threatening Ms. Hevener, in any way.

Again, when FBI questioned her, Ms. Hevener stated that Benjamin Egli never threatened or forced her to send him sexually explicit photos and videos of her child. She provided these sexually explicit videos and photos of her child and participated in live stream video chats with her child at Mr. Egli's request, because she knew he had a sexual interest in her son.

So, I think, these details are, certainly, important,

because when we're talking about what an appropriate sentence is in this case, Mr. Price is absolutely correct, the numbers, here, are off the charts, right. We have a sentencing recommendation to the Court via the guideline range and a suggested appropriate sentence of life.

Well, why is that? It's because every single enhancement, aside from the fact that the base offense level here is extremely high at a 32, every single sentencing enhancement that could be applied here applies to Mykayliah Hevener.

She has an additional four points, because this is a child under the age of 12, an additional two levels because the offense involved sexual contact, the masturbation. She has an additional two levels, because she distributed the child pornography. She has an additional four levels, because, beyond being under the age of 12, we, actually, are dealing with a toddler. She has an additional two points, because she is the baby's parent. She has an additional two points, because she used a computer.

And, then, we, also, see that she has this chapter for enhancement, because she engaged in a pattern of activity involving the prohibited sexual conduct.

So after she gets three levels off for an acceptance of responsibility, she's still at a level 50. Why is that so high? Why is that so far off the charts? Because there really is very little criminal conduct that is much worse than this. I will

say that, in reviewing some cases, I found a number of interesting sentencing hearings that various Courts participated in, and I'll speak to those in just a second, but what really is at issue here, when the Government comes to the Court and asks for the sentence that it has asked for, is that, implicit in the offense at issue in this case is the violation of the most foundational and fundamental relationships that exist in human history; that of mother and her child.

This is a relationship so vital to the proliferation of human civilization that there is, simply, none more revered and more protected, whether in medical, social, religious, historical, artistic, political or social context. To bear a child is to accept profound responsibility, a responsibility to honor the unwavering trust that a child places in its parent, especially, in its mother. To violate that trust that a child must have biologically in its parent is a violation of the most fundamental obligation that any human being has.

In sentencing Jane Ellen Campbell, the United States District Court for District of Maryland, Judge Bredar, says;

"Parents should protect their children, but when it comes to the law, we change the terminology to be that parents must protect their children. They are not just morally but legally obligated to look out for and protect their children from danger. The obligation to protect the child is implicit in the parent-child relationship, and what we have here is not only a

failure to protect the child but an affirmative act to harm one's own child.

"Society rejects that behavior, because we will come apart at the seams if that is replicated by others, and the way that we affirm the responsibility or the significance of that responsibility in this forum, in a criminal courtroom, is through the imposition of a sentence that expresses the appropriate abhorrence for what happened."

I see Mr. Price has cited to this case involving Michael Robert Heinrich and points to a sentence where Mr. Heinrich, clearly, is engaged in horrific criminal behavior, and for whatever reason, that case is a case that involves a 15-year sentence.

We can look at that case as something to model ourselves after or we can look at that case as something where, perhaps, there were factors outside of what is here on paper that we don't understand, but, certainly, I don't think that that should be something that influences the Court in any specific way because, really, it's fairly easy, when we're talking about criminal sentences, to find things at the very low end or the very top end, based on a number of factors that just aren't present or, sort of, aren't articulated in Defense's Sentencing Memorandum.

In considering that, first of all, just with regard to Ms. Hevener's Co-Defendant Mr. Egli, I've attached the plea

agreement that Mr. Egli, in the District of Iowa, has entered into. For his part in this conduct, and, additionally, for his possession of additional images of child pornography, unrelated to Ms. Hevener's child, Mr. Egli entered into an 11(c) plea, essentially, entered into a plea that is a negotiated resolution with the Government, where he agrees to recommend a joint sentence. That joint recommendation of the sentence for Mr. Egli is a sentence between 420 months imprisonment and 480 months imprisonment.

So what that means is that if the Court accepts that resolution, Mr. Egli's participation in this conduct is going to cost him, at the very bottom, a 420-month sentence. Aside from her Co-Defendant, who, I think, should, certainly, at least, be instructive, when the Court considers a sentence in this case, what I did do is not look just to cases involving production of child pornography, which, sadly, there are just a proliferation of, but what I did look to were cases of mothers producing child pornography.

In the District of Maryland in 2024, this past August, Ashley Marie Tibbs, who was 34, was sentenced to 20 years in Federal Prison. She sexually abused two minor victims, being her children, who were, then, between the ages of 2 and 5. On each occasion, she sexually abused the victims, produced videos of the abuse, and sent the videos to a Co-Defendant in exchange for money.

In 2020, in the Northern District of New York, Amber Decker, who was 26 years old, was sentenced to 22 years for her part in the sexual exploitation and hands-on abuse of a two-year-old child, who was, again, her child.

In this case, on several occasions, in July and August of 2018, while she was living in New York and her husband was located out of New York, she videotaped her sexual abuse of the two-year-old, uploaded the video files to a Cloud storage account for her husband to view.

In the Western District of Pennsylvania in 2022, Rebecca Owens, age 25, was sentenced to 270 months or 22 1/2 years for her production of child pornography. She engaged in a sexually-graphic discussion and offered children known to her, including a minor, her child, to the other individual to be sexually abused. The Government presented the Court with evidence that, during the text message conversations, she, again, created and sent sexually explicit images of her child.

I will, also, note that, in that particular case, she was, approximately, 22 years old, at the time that she engaged in that conduct, and the Government, in the Government's Sentencing Memo, says that she experienced a difficult upbringing punctuated by horrific events, as more clearly explained within the PSR.

So that is a case where the Government acknowledges that the Defendant had this difficult upbringing punctuated by

horrific events, and that was a case where the Court sentenced her to -- the Court in The Western District of Pennsylvania sentenced her to 270 months or 22 1/2 years.

Your Honor, the examples, certainly, begin to escalate in the District of Kansas in 2022. Thommie-Lyn Stansky, 28 years old, was sentenced to two counts of Conspiracy to commit sexual exploitation producing child pornography.

She created an image of herself sexually abusing a four-year-old victim and another image of herself sexually abusing a two-year-old victim. She shared images with a male Co-Defendant. She was sentenced to 60 years.

In the Northern District of New York, in Syracuse, Emily Oberst, 25, sentenced to 60 years in prison for admitting that she took sexually explicit images of two girls, an infant and a four-year-old, and sent those images to a Co-Defendant Jason Kopp.

In this particular case, again, we are dealing with someone who has mitigation in the form of troubled life circumstances, and, also, someone who, interestingly enough, at the time that she was engaging in this behavior, was working at a school.

In the District of Maryland, Summer Nichole McCroskey, 25 years old, was sentenced to 80 years in Federal Prison for her conspiracy to sexually abuse a child from the age of four months to two years old. She produced videos and images documenting the sexual abuse of the child, which she

34

distributed to a male Co-Defendant and others using an encrypted messaging application.

Finally, Your Honor, Tammy Martin of New York, in the Northern District of New York was sentenced to 90 years for child pornography production, and in this particular case, there were three victims, and the Court sentenced the Defendant to 30 years, followed by 30 years, followed by 30 years.

She engaged in multiple instances of production and had a trove of separate files of abuse when she was arrested and prosecuted. In this particular case, she points to her self-reported childhood abuse, drug and alcohol addiction and psychological diagnoses.

So, I think, certainly, we can see that Courts are not deterred by the fact that someone may not have any criminal history, and, I think, the Courts rightly treat sentences, with regard to the mothers of these particular types of cases, mothers engaging in this criminal behavior severely, for the reasons that the Government mentioned.

Ms. Hevener, clearly, has violated the most sacrosanct relationship that she has ever had in her life. So, you know, when, if ever, I guess, maybe, the Court would ask the Government, is a 15-year sentence appropriate? And every case is clearly different.

I think of cases that, for various reasons, the Government does prosecute and, you know, when I look at some of those

cases and see cases where you have a relatively young Defendant and they are producing child pornography with an older teenager, and, perhaps, that older teenager, while, certainly, perhaps, being groomed or being coerced through a conversation or promises of gifts, when we see, sort of, that tight age disparity between the two, and we see a young teenager who is, perhaps -- again, I don't want to use the word, willingly -- but, sort of, engaging in that type of behavior willingly, perhaps, those are cases where the Court should seriously consider a mandatory-minimum sentence, but what we are dealing with here is something far beyond that, we are dealing with a mother of a one-year-old, then two-year-old baby.

Finally, Your Honor, as I mentioned, the sentence that Ms. Hevener is asking for is a sentence that would place her back into the community at a time when her children will still be at a vulnerable age.

At the very least, you know, I think, that is a serious consideration for the Court to take under advisement and think about what type of sentence is going to allow her children the opportunity to, perhaps, as she puts it, re-unify, what type of sentence would allow that to happen on their terms, when they may be ready to do that?

And I think that a sentence that allows her to try to engage in that endeavor, when they are at a vulnerable age, as pre-teenagers, is not appropriate, so for those reasons, Your

Honor, the Government is asking for a sentence of 30 years.

The only other thing I will add, and I don't know if the Court intends to ask this or not, so I'll just raise it, the child's father and grandmother may wish to speak, so I would just ask the Court for some time to do that, if and when that's appropriate.

THE COURT: Sure. With regard to that, so there are individuals that wish to address the Court, on behalf of the victim?

MS. BERTI: I'm not sure. So the grandmother would like to speak.

THE COURT: Sure. Come right up. Take your time, take a deep breath and go right ahead.

THE WITNESS: Thank you for allowing me to speak this morning. I'm here as a mom, I'm here as a grandmother, I'm here for my grandson Miles. He's currently 3. Of course, he's unable to talk for himself.

I think that, for our family, when we received the news that this even happened to him at such a young age, it has been quite the railroad for us. My son, of course, his whole foundation fell out from underneath him. He has another baby coming, and, of course, a mother that hurt his son.

He had to restart his own life, you know, he was a stay-at-home dad, a very proud dad of his son, and, at one point, he was very proud of her, the Defendant.

I just want everybody to understand he didn't consent to anything. I think of his future, I think of how the cyber world is. Will he come across this in the future? How do we raise him? What are his consequences from her that we have to deal with? And it isn't even, we, because I'm not going to be here forever, it's going to be my son, and he has no trust in anybody.

He's trying very hard to be a dad to a newborn and a three-year-old who does have some special needs. Currently, right now, I do help with the both of them so he can work. I do see my grandson thriving, but I, also, see a little bit of the result of what happened to him.

I used to have a bond with my grandson that was so unimaginable. When he was born, I was there, I was the first one to hold him, that was one of my things on my bucket list that both of the kids granted to me. There was a time that she had left and took my grandson for quite a few months. And when he came back, he wasn't the same, but we never knew why.

He didn't come to Mimi, he didn't hug Mimi and kiss Mimi no more. I'm still working on those things and those bonds and trusts with him. And I think, for me, and for any female, we are girls, we are women, we go from women to having children and taking on the responsibility of what is in the best interest of our children. We don't make mistakes, we make choices. Do we suffer consequences for some of our choices? Of

38

course. But this choice here is just -- I feel like we're in a Lifetime movie and it's never ending.

I do go at a loss for words on this, but what I do want to say is, in the end, Miles had no choice but to be a participant in such an ugly crime that I don't even understand, as a mom, as a grandmother and, hopefully, at some point, a great grandmother, and I'm hoping I never, ever have to deal with this again.

I agree with the Prosecution, I don't think she should have contact with her children at impressionable ages, especially, a daughter. If you can't protect your child and engage in these kinds of things, what are you going to teach your other kids? I think that's all I have to say for now.

THE COURT: Thank you. Ms. Berti, go ahead.

MS. BERTI: I have nothing further, Your Honor.

THE COURT: It was only that witness, on behalf of the victim; correct?

MS. BERTI: That is correct, Your Honor.

THE COURT: Let me just add something. I know that that witness mentioned something that struck the Court, relative to potential custody determination. This Court is not -- that matter is not before this Court, that is State Court, okay, that would be a State Court matter.

So I just wanted to address that, in terms of contact, particularly, with the other child by the mother, in this

particular case, the victim is the toddler we're talking about. That's another matter. But, again, not a custody determination. Thank you. Anything further, Ms. Berti?

MS. BERTI: No, Your Honor.

THE COURT: After careful review of the Pre-Sentence Report, the Sentencing Memos with attachments that I have reviewed, the exhibits that the Government attached, counsel's arguments here today, hearing from the Defendant, hearing from the witness that the Government presented, the paternal grandmother, and after calculating the guidelines, I must, now, consider the relevant factors set out by Congress at Title 18 USC Section 3553(a) to ensure that I impose a sentence sufficient but not greater than necessary to comply with the purposes of sentencing, and the purposes include the need for the sentence to reflect the seriousness of the crime, to promote respect for the law, to provide just punishment for the offense, the sentence should, also, deter criminal conduct, protect the public from future crime by the Defendant and promote rehabilitation and/or treatment.

In addition to the guidelines, let me just say, this Court is considering all of the guidelines -- you know, the guidelines, certainly, all the factors, the policy statements, as well as the purposes, in entering a sentence, but I must consider the following:

And, frankly, let me just start by saying, Each case does

need to be looked at by the Court, individually, and this is how the Court does the analysis, by very particularly looking at the facts, pulling things apart, in terms of the offense, in terms of the Defendant, and I can assure everyone here that the Court has done exactly that.

Let me start with the nature and circumstances of the offense. This can only be described as a repulsive offense, okay, really awful, an awful set of circumstances before the Court, particularly, since it involves what was done directly to a toddler by you, Ms. Hevener, and, in fact, the fact that the toddler was your own child, and the Court sees that as a breach of the most precious trust. A child is -- when a child is born, that child trusts -- the first one the child trusts is their mother.

In this particular case, there was video chatting and video recording of your little boy, with sexually explicit scenes involving your little boy and yourself, with sexually explicit contact by you with your son for sexual gratification of another person, that Mr. Egli, to gain that man's attention or attraction. And, you know, I don't know, maybe, a little bit for your own, I don't know that.

What's been presented is for the purposes to gain that individual's attraction, when, all the while, you knew what Mr. Egli was and what he was involved in and interested in. What's been presented, what I've reviewed is that what you're aware of

41

that he was interested in was child abuse, child sex abuse material, child porn and incest material, and, in fact, you told authorities that, and you were aware he traded in that, and that's why you did it, so he could get some of that to engage in those communications with others like him.

So you made all these videos and the images, and you shared those with him, as he requested. Clearly, it was that his attention was not focused on you, when you were appearing in the videos, but rather focused on your little boy, and he directed you to do certain things that we have already mentioned about taking off under garments and removing a diaper so that he could see the child and his private parts.

And how did you respond to that? You didn't say, No, I'm not going to do that, get away from me, I don't want to have anything to do with you, to protect your son, but the response was a smirk, a smirk, which leads me to believe that there was an understanding between you and him about what he was, actually, having you do.

And you complied and put the child, knowingly, before this person, and it was clear that's what it was all about, what he was interested in, and you let him have that opportunity, and that shows me there's no protective capacity, as a mother, by you, so you would do that and exploit your own son.

This conduct continued, and it continued for a period, as I hear, for a period, and I saw, about nine months. Let me just

go back for a minute. In that first production, if you will, that Snapchat interaction, you, also, had allowed the baby to touch your breasts and have Mr. Egli view that, and in holding him nude before Mr. Egli, you encouraged him to touch your own privates.

These are difficult things to go through, but these are the things that the Court is considering in this case, the very particulars and what this case is about.

But the other video showing you engaging in contact with your son, and, you know, touching his privates and asking if he liked that. Certainly, a little boy, you, as the mother, should understand that a little boy, a little child at the age of, approximately, one years old knows nothing about such behaviors. Little children are innocent creatures, and in this situation, a child of that age should be playing with stuffed animals and watching Disney movies with you.

Additionally, three other images or more, but, at least, what I have before me, I know there was mention of others, but, at least, three images where you took pictures of him, where you were rubbing the baby's privates in a tub, and others where you had the baby touching your privates or near your privates.

These videos and images were on your own phone, law enforcement found them, through their investigation. Even though he's a toddler, when this occurred, he may very well have lasting effects from this. The grandmother has indicated

that she observed a change in him, in some way, shape or form, so there may be lasting effects from this, memories of this, even at that young age, that can affect a child detrimentally, in relationships or emotionally, even physically and/or developmentally, okay, down the road.

And I know that the Government has requested to leave open the restitution issue.

And this, as I mentioned, went on for a period of nine months, what occurred, those types of instances. Frankly, those are forms of trauma to a child. I didn't go to you, yet, I'm still talking about the crime. I am struck by your addressing the Court, certainly, hearing all the words you say, but the lack of emotion.

And, additionally, going back to the videos and images of him, I would say, too, that, as he ages, we don't even know if Mr. Egli had put those -- I don't know this -- but since he traded things online, those images, those videos, may very well be out there for others like Mr. Egli to view, as time goes on.

I want to go to, really quick, and address what Mr. Price indicated. He talked about United States v. Heinrich. I see real differences with this case, between the two cases and this case, certainly, I think I've already addressed some of those, you know, the fact that this was your own child, there were interactive videos with another, for that person's gratification, you know, knowing full well what interested this

individual and how this individual behaved, during those interactive videos, would, certainly, kind of -- a light would go off, like, This is bad. But yet it continued, knowing full well what he was involved in and what he had told you, how he traded those things online, and the conduct, in terms of putting the child before him, and I've already addressed, in terms of the protective capacity, so I see this very differently than that case.

Now, the history and characteristics of the Defendant. You are, currently, 26 years old, you were, approximately, 24 at the time that the offense occurred. You have no prior criminal history, you have moved to Carbondale from another location, I believe, in Pennsylvania.

You had an unfortunate early upbringing, and, then, were placed with a Foster family, and I believe the Foster family, along with your brother, at that time, when you were both, approximately, you know, very young, when you were toddlers. You have no relationship with your biological father, your own biological mother was unable to provide care, due to addiction issues.

Your Foster parents, you regard them as mom and dad, and your background with them was a very positive childhood, in fact, you indicated that they spoiled you and your life was easy. You endured no abuse in the household, they provided a stable home for you, however, through any contacts you did have

growing up, as time went on, with your biological mother, they were -- and the Court recognizes -- negative experiences, where she was physically abusive, to some extent, with you, and she continued to use illicit drugs, and you were exposed to that.

You report to Probation that you, yourself, endured instances of sexual assaults or sexual abuse as a minor and as an adult. There were no charges filed against anyone related to these instances, and your Foster mother has limited knowledge of the abuse. However, through your childhood, you continued -- you have friends and you participated in positive extracurricular activities growing up.

Your Foster mom indicated to Probation that she believed you suffered from effects of your mom's substance abuse, and her reaction to all of this was shock, as to what the crimes here consisted of. She was shocked by that, and the production of child pornography that you did.

She noted that you were a hard worker, that you worked and you cleaned your home, and you have another child with the victim's father who is, approximately, two months old, that you had in jail. The victim, your son, is now three years old.

The father of your children, Mr. Dodson, who is here today, as well as his mother, who is taking care of the other child. Mr. Dodson, I believe, is taking care of the victim. He is, somewhat, supportive of you, but unsure and concerned about your son, medically.

46

You have issues with cholesterol, it's managed with medication, you have issues with low blood pressure, also, managed with medication. You have a condition that you've experienced fainting spells.

Your mental health history, you have an extensive mental health history that goes back to when you were a young girl, and that is pursuant to your Foster mother has reported that to Probation. Probation, also, indicates that you were diagnosed with ADHD, Bipolar disorder, and these issues had been managed with medications, although, your Foster mother disagrees, I believe, with an earlier diagnosis of ADHD.

You were, more recently, diagnosed with PTSD, an anxiety disorder, and additional medications have been ordered, I believe, over in the jail, relative to same.

You have a history of a suicide attempt, when you were a teenager. While incarcerated, you experience night terrors and that had been managed with medication. As far as a substance abuse history, you have -- they've indicated to the prison that cannabis abuse, but no substance abuse history beyond that, okay.

You're a high school graduate, your attendance was average to poor, but you graduated high school. You were employed, and this has been mentioned by counsel, prior to incarceration, you were employed at Riverside High School in Maintenance for, approximately, three years. Prior to that, you worked in

47

cleaning or factory work, through various employers.

So, look, the sentence that I impose must be sufficient but not greater than necessary to comply with the purposes of sentencing. This sentence will and must reflect the seriousness of this crime. It will help to promote respect for the law. It will provide just punishment and protect the public, which is absolutely necessary here, where you were willing to put your own child in harm's way, not someone else's child, but your own child. It will deter criminal conduct by you and others like you, who would be willing to put their own children in harm's way, in this type of instance.

I'm, also, considering the need to avoid unwarranted sentencing disparities. This sentence is not significantly different from those of others similarly situated, and I am taking into consideration your background and your crimes, specifically, in fashioning this sentence.

I am giving notice that I intend to vary downward from the guidelines of 360 months for the following reasons:

The serious mental health issues that the Defendant has. What's noted as prior sexual abuse, I'm taking that into consideration, that she was -- and going back to mental health issues that she had since the time she was a young girl, which were verified by her Foster mother. That she is a first-time offender, there's no criminal history by her, the age, at the time of her actions, when she committed the crime, that she was

young, 24 years old. Additionally, her work history.

As I indicated, the sentence will satisfy the purposes of sentencing, and the sentence that I impose will be sufficient and, frankly, significant but not greater than necessary.

I would also say that, as far as, I mentioned I've considered all of the factors here, but a sentence of 324 months or 27 years speaks to the egregious nature of the crime and takes into consideration the Defendant's circumstances with ten years supervised release.

I find that it is, certainly, as I said, sufficient but not greater than necessary. I am making a finding that the Defendant does not have the ability to pay a fine. I'm, also, leaving open for the Government to present evidence regarding restitution, as, also, there's no objection to same, but it is, also, mandatory.

So with that, please rise for sentencing, Ms. Hevener.

Pursuant to the Sentencing Reform Act of 1984, it is the Judgment of this Court that the Defendant Mykayliah Hevener is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 324 months.

It is Ordered that the Defendant shall pay to the Clerk of The United States District Court a special assessment of $100, due immediately.

The Defendant is determined indigent and is not subject to the provisions of the Justice For Victims Trafficking Act of

49

2015 requiring a special assessment of $5,000.

As I mentioned, the Court finds, as far as restitution, that that shall be deferred, kept open, should any request for restitution be presented, as allowed under 18 USC Section 3664(d)5 with notice and hearing by a showing of good cause.

And as I mentioned, the Court finds that the Defendant does not have the ability to pay a fine.

Upon release from imprisonment, the Defendant shall be placed on supervised release for a term of ten years. Within 72 hours of release from the custody of the Bureau of Prisons, the Defendant shall report in person to the Probation Office in the district to which the Defendant is released.

While on supervised release, the Defendant must not commit another Federal, State or local crime and must not possess a dangerous weapon. The Defendant must comply with the standard conditions adopted by this Court and the following additional conditions:

You must cooperate in the collection of a DNA sample. You must participate in the mental health treatment program, in a mental health treatment program and follow the rules and regulations of that program.

The Probation Officer, in consultation with the treatment provider, will supervise your participation in the program, provider, location, modality, duration, intensity, etc., which could include an evaluation and completion of any recommended

treatment. You must take all mental health medications that are prescribed by your treating physician.

You must not have direct contact with any child you know or reasonably should know to be under the age of 18, without the permission of the Probation Officer. If you do have any direct contact with any child you know or reasonably should know to be under the age of 18, without the permission of the Probation Officer, you must report this contact to the Probation Officer within 24 hours.

Direct contact includes written communication, in-person communication or physical contact. Direct communication does not include incidental contact during ordinary daily activities in public places. There shall be no contact by you with the victim in this case.

You must not go to or remain at any place where you know children under the age of 18 are likely to be, including parks, schools, playgrounds and child care facilities. You must participate in a sex offense-specific treatment program and follow the rules and regulations of that program. The Probation Officer will supervise your participation in the program, provider, location, modality, duration, intensity, etc., which could include an evaluation and completion of any recommended treatment.

You must submit to periodic polygraph testing at the direction of the Probation Officer as a means to ensure that

you are in compliance with the requirements of your supervision or treatment program.

You must submit your computers, as defined by 18 USC Section 1030(e)1 or other electronic communications or data storage devices or media to a search. You must warn other people who use these computers or devices capable of accessing the internet, that the devices may be subject to searches, pursuant to this condition.

A Probation Officer may conduct a search pursuant to this condition, only when reasonable suspicion exists that there is a violation of a condition of supervision, and that the computer or device contains evidence of this violation. Any search will be conducted at a reasonable time and in a reasonable manner.

To ensure compliance with the computer monitoring condition, you must allow the Probation Officer to conduct initial and periodic unannounced searches of any computers, as defined in 18 USC Section 1030(e)1, subject to computer monitoring.

These searches shall be conducted to determine whether the computer contains any prohibited data, prior to installation of the monitoring software, to determine whether the monitoring software is functioning effectively after its installation and to determine whether there have been attempts to circumvent the monitoring software after its installation. You must warn any

other people who use these computers that the computers may be subject to searches, pursuant to this condition.

You must submit your person, property, house, residence, vehicle, papers, computers, as defined in 18 USC Section 1030(e)1, other electronic communications or data storage devices or media or office to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release.

You must warn any other occupants that the premises may be subject to searches, pursuant to this condition. The Probation Officer may conduct a search under this condition, only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contained evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

You must comply with the requirements of The Sex Offender Registration and Notification Act, under Title 42 USC Section 16901, et. seq, in the location where you reside, work, are a student or were convicted of a qualifying offense, and you must not communicate or otherwise interact with the victim, either, directly or through someone else, without first obtaining the permission of the Probation Officer.

Ma'am, you can appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary or if there is some other fundamental defect in the proceedings that

53

was not waived by your guilty plea. You, also, have a statutory right to appeal your sentence, under certain conditions, particularly, if you think your sentence is contrary to law.

However, a Defendant may waive those rights, as part of a plea agreement, and you have entered into a plea agreement which waives some or all of your rights to appeal your conviction and/or sentence.

Such waivers are generally enforceable, but if you believe the waiver is unenforceable, you can present that theory to the Appellate Court. With few exceptions, any Notice of Appeal must be filed within 14 days after sentence is imposed on you. That is 14 days from today.

If you are unable to pay the costs of an appeal, you may apply for leave to appeal In Forma Pauperis. If you so request, the Clerk of the Court will prepare and file a Notice of Appeal on your behalf.

Ms. Berti, is there anything further, on behalf of the Government, including a request for dismissal of any remaining charges against the Defendant?

MS. BERTI: Yes, Your Honor, as the Court has articulated, the Government is requesting the right to reserve restitution for a determination to be made at a later date.

THE COURT: There's no objection from the Defense?

MR. PRICE: No, Your Honor.

THE COURT: Okay, and that is granted.

54

MS. BERTI: Further, with regard to Count 2 of this indictment, the Government does move, at this time, to dismiss Count 2 Distribution of child pornography, as relates to Ms. Hevener.

THE COURT: Any objection from the Defense?

MR. PRICE: No, Your Honor.

THE COURT: That is granted. Anything further from the Government?

MS. BERTI: No, Your Honor.

THE COURT: Anything further from the Defense, before we conclude?

MR. PRICE: Yes, Your Honor. We would just ask that the Bureau of Prisons be put on notice that Ms. Hevener should be evaluated and placed in a facility that is suitable to treat her mental health needs.

THE COURT: Any objection from the Government?

MS. BERTI: No, Your Honor.

THE COURT: The Court will certainly make that recommendation.

Is there any request relative to location, in terms of close to family, close to her Foster mom or I don't know?

MR. PRICE: Yes, Your Honor. We would ask that that be strongly taken into consideration and recommended, as well.

THE COURT: That's granted. I'll make that recommendation. Just so you know, Ms. Hevener, the Court can only make these

55

recommendations, it is not up to me, in terms of where you are placed, the location, or what facility you are placed in, that is up to the Bureau of Prisons. But the Court will certainly make those recommendations on your behalf, okay?

THE DEFENDANT: Okay.

THE COURT: Okay, anything further from the Defense?

MR. PRICE: No, Your Honor.

THE COURT: Good luck to you, ma'am.

(At this time the proceedings were adjourned.)

C E R T I F I C A T E

I, KRISTIN L. YEAGER, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.

S/Kristin L. Yeager
KRISTIN L. YEAGER, RMR,CRR
Official Court Reporter

REPORTED BY:

KRISTIN L. YEAGER, RMR,CRR
Official Court Reporter
United States District Court
Middle District of Pennsylvania
P.O. Box 5
Scranton, Pennsylvania  18501

(The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)